HENRY J. McMILLAN, Respondent, *v.* UNION PRESS-BRICK
WORKS, Appellant.

### January 14, 1879.

1. The master is bound to use ordinary care to procure suitable machinery, and
to keep it in such a condition that the risk to his employees will not be
greatly increased by wear and tear. Any such greatly increased risk is the
negligence of the master, for which he is responsible.

2. Where the evidence is conflicting, the question of negligence is for the jury,
under proper instructions.

3. Where the injury is the loss of an arm, a verdict will not be set aside merely
because there was no evidence from which a jury could calculate with
accuracy the actual money-loss to plaintiff. The jury may give a round
compensation, taking into consideration mental and physical suffering,
although the case be not one for punitive damages.

APPEAL from St. Louis Circuit Court.
*Affirmed.*

S. M. BRECKINRIDGE and L. S. METCALFE, Jr., for appel-
lant, cited: *Nolan* v. *Shickle*, 3 Mo. App. 304; *Meyer* v.
*Railroad Co.*, *ants*, p. 27.

A. R. TAYLOR and S. D. McCORMICK, for respondent.

BAKEWELL, J., delivered the opinion of the court.

This is an action by a minor, who sues by next friend,
against defendant, a corporation, for damages caused by
the negligence of defendant in failing to provide safe ma-
chinery, by reason of which the plaintiff, whilst in defend-
ant's employ, lost his hand. There was a verdict and judg-
ment for $1,000; and defendant appeals.

The machine at which plaintiff was working at the time
of the accident was a brick-machine. On a mould-wheel
five feet in diameter, which revolves horizontally, is placed
a bed-plate containing eighteen brick-moulds. The moulds,
in passing under the feeder where they receive the clay, are
covered; but they pass over a space of about fourteen inches
which is uncovered. The bottom of each mould is movable,
and is called a plunger. This plunger, by means of an in-

cline, is brought level with the bed-plate as it emerges into the open space ; and after passing over this space up to a point within an inch or two of the frame, begins to sink, and declines gradually whilst passing over the remaining space, until it reaches the frame or covered feeder, at which point, or at a very short distance beyond which point, it drops to the bottom of the mould so as to receive a fresh charge of clay.    The wheel makes three revolutions a minute, and it is the duty of a person employed for that purpose to pass a greased rag over the plunger whilst it is exposed and level with the bed-plate.    The object of this is to prevent the clay sticking to the bottom of the mould. The greasing must be done rapidly ; the hand is passed two or three times over the plunger, and if the hand remains after the plunger begins to sink, there is danger that it may be drawn along to the covered part of the machine, and be cut off by the meeting of the two surfaces.    There is some conflict of testimony as to whether the plunger properly drops before it reaches the frame.    Some witnesses testify that it must necessarily drop about four and a half inches before leaving the open space, and others say that whilst, in the machine at which plaintiff was working, the plunger drops half an inch before reaching the frame, at other machines in the same yard it does not drop before reaching the frame.    At the time of the accident plaintiff was in his sixteenth year.    There is evidence tending to show that he was employed as a cob-hacker, — that is, as one of those who place the soft bricks coming from the machine in rows to dry ; that it was the rule of the yard that any boy employed about the place must, if the greaser was obliged to leave the machine, take his place for a time if called upon ; that the greaser employed upon the southmost of the three machines in the yard, was taken sick, and called upon plaintiff to take his place, and that plaintiff did so.    Three boys are at each machine, — two to remove the bricks, and one to grease.    A brick dropped, and plaintiff was called upon by

one of the boys to remove it. They were all three standing together in front of the machine, in their proper place, a depression called the pit, about five feet long, just large enough for the three boys to stand and work in. Plaintiff testifies that it was the duty of the greaser to keep this pit clean; that when a brick falls, the takers-off are liable to slip on the wet clay, and the greaser is required to remove it at once. He stooped to remove the brick, and whilst he was in a half-stooping position, with his hand on the bed-plate, engaged in greasing, his hand was carried to the edge of the frame and cut sheer off, so that it fell into the pit and was picked up by one of the other boys. Plaintiff had been, on three occasions before, called upon to grease for a short time at another machine in the same yard, and had done so. There was testimony tending to show that the plunger in the other machine did not fall so soon as did the plunger in the machine at which the accident happened; that, owing to the wear of the machine, there was a difference in the incline which moved the plungers of the two machines, and that this caused a greater depression of the plunger in the machine at which the accident happened, of nearly a quarter of an inch, and caused the plunger to fall four and a half inches before reaching the bed-plate. Plaintiff testified that at the machine which he had formerly greased, the plunger did not fall before it reached the bed-plate, and that he did not know that it would fall before reaching the bed-plate at the machine at which he was hurt; that some clay was sticking to the plunger, and that he was trying to remove it, and that owing to the clay on the plunger he did not see or feel that the plunger was falling. There was testimony that the difference between this machine and the others used on the ground was such as to increase the risk of the greasers. There was a conflict of testimony as to whether the plungers could be efficiently greased by mops, so as to avoid the use of the hand on the plunger, and also as to whether any efficient system of guards could be adopted.

After the accident, a guard was placed on this machine, but was afterwards removed by the foreman, who considered that it rather increased the risk. There seems to be no doubt, from the evidence, that the machines used in the yard were all substantially alike, — made at the same foundry; that their parts were interchangeable, and that any difference between them was caused by the gradual wear of the incline over which the plungers pass, and which causes the plungers to rise and fall.

There was evidence that the father and mother of plaintiff had, for a valuable consideration, released to defendant any claim which they might have on account of the injury done to their son.

The servant engaged in any employment, dangerous or not, takes the ordinary risks of his employment; and if he has to do with dangerous machinery, he must use proportionate care. But extraordinary risks, that might be foreseen by the master in the exercise of ordinary care and foresight, the servant does not take. The master must make use of ordinary care to procure suitable machinery, and to keep it in such a condition that the risk to his employees will not be greatly increased; and any such greatly increased risk is the negligence of the master, for which he is responsible. Extraordinary care to make machinery as safe as possible, by means of all devices which ingenuity may suggest, is not required; but if ordinary care and diligence requires the placing of a guard, it must be done.

The doctrine of negligence and contributory negligence, and of the duties of employers in regard to the furnishing of proper appliances for the use of their employees, has been so frequently and so recently examined by this court that it is unnecessary to do more than refer to some of the cases. *Nolan* v. *Shickle*, 3 Mo. App. 300; *Kempinger* v. *Railroad Co.*, 3 Mo. App. 581; *Meyer* v. *Railroad Co.*, *ante*, p. 27; *Dowling* v. *Allen & Co.*, *ante*, p. 195; *Bridges* v. *Railroad Co.*, *ante*, p. 389.

The question of contributory negligence was fairly put to the jury. It is strongly insisted that the boy was careless in removing his eye from the machine, and stooping to pick up the fallen brick. He says that he had his eye on the plunger; his testimony goes to show that his position at the time had nothing to do with the accident; that the delay was caused by his effort to remove a piece of clay that adhered to the plunger; and there is some testimony to the effect that the presence of this clay prevented him from perceiving that the plunger was about to fall. There was also evidence tending to show that it was made his duty, by the rules of the yard, to keep the pit clean; and the presence of the wet clay was liable to cause those in the pit to slip, which might evidently have endangered him. He says that the clay had begun to stick to the moulds when he got to the machine, and that from his experience of the other machines, at which alone he had been employed before, he had no reason to believe the plunger would fall before it reached the frame. The whole testimony of the boy reads extremely well in the record; the jury might well believe him; and it can by no means be said that contributory negligence was so made out as to warrant the court in taking this case from the jury.

There was some evidence to support the verdict, and the court committed no error in refusing the instruction for a nonsuit asked at the close of plaintiff's case.

It is complained that the first instruction asked for plaintiff is unmeaning. This instruction tells the jury intelligibly enough, we think, that the release given by plaintiff's parents to defendant is a release of no part of plaintiff's claim for any damages sustained by him personally, but that no recovery can be had for any loss of possible earnings by plaintiff during his minority. The instruction can be understood to mean nothing but this, and is susceptible of no interpretation which could prejudice defendant in the least.

It is said that the second instruction for plaintiff is

bad because the evidence that the oiling could be done only by hand is uncontradicted, and because the instruction assumes that the oiling was dangerous work, and because there is no evidence that plaintiff was ignorant of the danger of oiling these moulds.

That the oiling is very dangerous work seems to be quite clear from the evidence. The utmost that can fairly be claimed for defendant, as to that, is that some witnesses said the work was not dangerous if due care was used. It is manifest that a momentary inattention, or a mere slip of the foot, might cause a dreadful injury to the boy employed in oiling. The thing must be done, as one witness says, " in the turn of a hand." The actual time during which each plunger was exposed for oiling, by the movement of the wheel, was one second and a very small fraction. Fifty-four plungers passed over the open space in sixty seconds; and if the rag is not removed before the plunger begins to fall, mutilation appears to be the probable result. The weight of the evidence seems to be that the oiling could not be done so well by means of a mop, and that the employees preferred the use of the hand; but there was some testimony to the effect that a mop might be used, that it is efficiently used on similar machines, and that the objection to it is that it consumes too much oil. Something, in cases of this kind, may be left also to the common sense of the jury. It does not need an expert to tell us that if, as the testimony is, these plungers come up level with the bed-plate for the purpose of being oiled, every part of their surface can be touched with oil without the application of the hand, although it is quite likely that this can be more commodiously done with the hand. The plaintiff himself testifies that he was not aware of the danger of oiling the moulds, until after the accident.

Appellant contends that there was no evidence whatever that the brick-machine was defective in not having a guard. It is true that one foreman testified that the guard actually

adopted was discarded because, in his opinion, it endangered the knuckles of the boys and the tips of their fingers, and because one ˎboy lost a finger-nail by it. But another foreman testified that he considered the machine dangerous without a guard, and reported to defendant that a guard ought to be put on. This suggestion of a possible precaution is not in itself conclusive that defendants were negligent for not adopting it. But we think that there was evidence in the case from which the jury might find that a guard could well have been adopted which would have been a great protection to the hand, and that the machine at which plaintiff was working was defective in having no such guard. The testimony of all the witnesses is that the hand might remain safely upon the plunger so long as it was flush with the bed-plate, and that the danger began as soon as the plunger began to fall. It is probable, therefore, that a guard such as was suggested by the foreman, McMillan, which would make it impossible for the greaser to extend his hand to a point at which the plunger on this machine began to fall, would have obviated the danger. Whether such an appliance was practicable, and whether ordinary care and diligence required that some such contrivance should be used, were questions as to which the evidence is conflicting; as it was also as to the further question whether, owing to the wear of the incline, this machine was, and was known by defendant to be, or might with due care have been known by defendant to be, unusually dangerous. Defendant was bound in law to furnish to its employees appliances reasonably safe, considering the character of the business. Whether it did so or not, and whether, if it neglected its duty in this respect, this neglect was the efficient cause of the damage to plaintiff, were questions for the jury, as to which their verdict on the evidence might have been different from that which they actually found. But as there was some evidence to support the verdict, and as our attention is not called by counsel for appellant to any mate-

rial error in the instructions on these points, there is no ground here for the interference of the appellate court.

It is claimed that there was no evidence before the jury from which they could calculate the actual damage to plaintiff by the loss of his arm. This is not a matter of mere calculation. A verdict in a case of this sort need not be arrived at by determining the daily wages that the plaintiff might have earned with two hands from the age of twenty-one, and then estimating his expectation of life. An arm is worth $1,000 to a healthy boy of sixteen, as a mere matter of money, anywhere in the United States. The jury might give a round compensation, taking into consideration the bodily and mental suffering of plaintiff. The verdict cannot be called excessive.

Our attention is not directed by counsel to any material error in this record to the prejudice of appellant, and for which the judgment ought to be reversed. The judgment will therefore be affirmed. All the judges concur.